J-S38017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1872 EDA 2022 |

Appeal from the Decree Entered June 16, 2022
In the Court of Common Pleas of Wayne County
Civil Division at 18-AD-2022

BEFORE:  KUNSELMAN, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED NOVEMBER 29, 2022**

C.F. (Mother), appeals from the decree involuntarily terminating her parental rights to E.D. (Child) and changing Child's permanency goal to adoption.[1]  After careful consideration, we affirm.

Child was born in February 2019.  On December 18, 2020, Wayne County Children & Youth Services (WCCYS or the agency) became involved with the family at the request of the Pennsylvania State Police, who had reported Mother and Father's suspected drug abuse.  N.T., 6/7/22, at 4; *see also* Exhibit 1 (Permanency Plan, 1/4/21, at 1).  The WCCYS caseworker, Sarah Mooney, testified that Mother "was not present at the residence."  N.T., 6/7/22, at 4.  Further:

---

[1] The trial court also terminated the parental rights of L.D. (Father), who has appealed at 1871 EDA 2022.

The agency did try to case plan with [Father] at the home and [Mother] over the phone to avoid protective custody[;] however, both parents were very combative and stated they did not want [Child] and to place [her], or to place [Child] in foster care.

*Id.*

Child was adjudicated dependent on December 28, 2020. WCCYS established family service plan goals for Mother of cooperating and communicating with WCCYS; obtaining a drug and alcohol evaluation and following treatment recommendations; participating in random drug screens; obtaining a mental health evaluation and complying with recommendations; taking medications as prescribed; attending visitation with Child; maintaining a safe and suitable home for Child; and meeting Child's basic needs. *See* Exhibit 1 (Permanency Plan, 1/4/21, at 13-19).

Child's placement had some "twists and turns." *Id.* at 5. Ms. Mooney testified that Mother's compliance was mostly "minimal." N.T., 6/7/22, at 25-41. However, Mother was compliant at one point; as a result, CYS returned Child to Mother. *Id.* at 25. Specifically, CYS returned Child to Mother on October 15, 2021, but placed Child back with her foster parents two weeks later, on November 1, 2021, after Mother tested positive for methamphetamines. *Id.* at 5-6. WCCYS also attempted kinship care. WCCYS placed Child with her maternal grandparents, although maternal grandmother was not permitted to be alone with Child. *Id.* at 6-7. The placement was unsuccessful, and the agency removed Child from maternal grandparents' care a few months after placement. *Id.*; *see also* Exhibit 1 (Permanency

Plan, 1/4/21, at 1 (stating maternal grandparents "failed drug screens, [maternal grandfather] had a criminal record and [maternal grandmother] has a PFA against someone in NJ.")). Child was placed with her foster parents three times and has remained with them since November 2021. *Id.* at 8.

The trial court conducted permanency review hearings on January 4, 2021, October 12, 2021, November 1, 2021, and February 8, 2022. On February 8, 2022, the trial court "found minimal compliance and no progress with the permanency plan by Mother." Opinion and Decree, 6/16/22, at 2. On April 11, 2022, WCCYS petitioned for termination of Mother's parental rights. The trial court held a hearing on June 7, 2022. At that time, Child was three years old and had been in placement for 16 months. N.T., 6/7/22, at 47, 122.

In addition to Ms. Mooney, WCCYS presented testimony from a licensed psychologist, Dr. Brittney Tunilo. WCCYS sought to introduce Dr. Tunilo's testimony "specifically as it regards [Dr. Tunilo's] bonding evaluation" of Mother and Child. *Id.* at 78. The parties stipulated to Dr. Tunilo's expertise in forensic psychology. *Id.*

Mother testified in opposition to termination. Mother admitted to her drug addiction, but stated she was in recovery. *Id.* at 88. Mother testified that she takes prescribed medication and THC; she stated she was "waiting for the [medical marijuana] license." *Id.* Mother also described having successful part-time employment at Lowes and living temporarily with her

mother and brother, although she was working with the "SHARE" program to obtain housing. *Id.* at 89. Mother testified to having a bond with Child. Mother stated the bond was "absolutely not" severed by Child's placement in foster care, and "each visit we have I feel as though it gets stronger." *Id.* at 90.

By decree entered June 16, 2022, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2),(5),(8) and (b). Mother timely appealed. Mother and the trial court have complied with Pa.R.A.P. 1925.[2]

Mother presents the following questions for review:

I. Whether the trial court erred in concluding that the Appellant Mother demonstrated an unwillingness or inability to provide the minor child with the essential parental care necessary for her physical or mental well-being?

II. Whether the trial court erred as a matter of law in determining that the parental rights of the Appellant mother, C.F., was warranted?

III. Whether the trial court erred as a matter of law in determining that the termination of parental rights of the Appellant mother[,] C.F., would serve the developmental, physical and emotional needs and welfare of the minor child?

Mother's Brief at 4.

In reviewing Mother's issues,

---

[2] After reviewing Mother's Rule 1925 concise statement, the trial court concluded "there are no issues which merit an appeal," and "incorporate[d] and adopt[ed] the entirety of the June 16, 2022 Opinion and Decree." Statement of Reasoning, 8/4/22.

our standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in ***In re: R.J.T.***, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

WCCYS has the burden to prove by clear and convincing evidence that its asserted grounds for termination are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** Under 23 Pa.C.S.A. § 2511, "the court must engage in a bifurcated process prior to terminating parental rights." ***In***

*re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).  Initially, the focus is on the conduct of the parent pursuant to § 2511(a).  *Id.*

<u>Section 2511(a)</u>

Mother first challenges the trial court's finding as to grounds for termination under Section 2511(a).  This Court need only agree "as to any one subsection in order to affirm the termination of parental rights."  *In re A.S.*, 11 A.3d 473, 478 (Pa. Super. 2010).  Thus, we address the second subsection, which provides for termination when a parent's

> repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) "emphasizes the child's present and future need for 'essential parental care, control or subsistence necessary for his physical or mental well-being.'" *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citation omitted).  Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct.  *Id.*  "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, her [parental] rights may be forfeited."  *Id.* at 83.  The grounds for termination under § 2511(a)(2) may include acts of refusal as well as incapacity to perform parental duties.  *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021).  We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt

assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166

A.3d 434, 443 (Pa. Super. 2017).

> Instantly, Mother argues
>
> the trial court's determination that WCCYS met their burden is reversible error. WCCYS failed to meet their burden in proving that termination of rights was warranted under 23 Pa.C.S. Section 2511(a)(2), (5), (8) and WCCYS did not supply Mother ample time and opportunity in which to remedy the situation that necessitated the child's second removal. Absent evidence of [M]other's inability to remedy that situation, the termination Decree cannot stand.

Mother's Brief at 10.[3]

Mother concedes that as a result of her drug addiction, "the first element

of § 2511(a)(2) has been met." *Id.* at 14; *see also* 23 Pa.C.S.A. § 2511(a)(2)

(incapacity of parent has caused child to be without essential care). However,

Mother claims the evidence "suggested Mother's willingness to remedy as she

was actively engaged in all of the recommended treatment at the time of the

hearing." Mother's Brief at 15. She states: "It appears that the agency solely

relied upon Mother's drug use as the condition that was not remedied[.]" *Id.*

Mother asserts she "demonstrated a commitment to reunification and a desire

for the same in a timely manner." *Id.* Mother emphasizes she "was honest

with the agency" and "was willing to immediately resume custody of her child."

*Id.* at 17. We are not persuaded by Mother's argument.

---

[3] WCCYS and Child's counsel have not filed briefs.

As stated above, this Court applies a deferential standard of review. ***In re Adoption of S.P., supra*** (appellate courts must defer to trial judges when factual findings are supported by the record and the trial court's legal conclusions are not the result of error). Upon review, we are not persuaded by Mother's argument.

The trial court made the following findings:

1. Since November 1, 2021, Mother attended 43 of 66 visits offered with [Child].

2. Mother tested positive for methamphetamine/amphetamine on November 10, 2021, November 25, 2021, December 7, 2021, December 8, 2021 and January 4, 2022. She tested positive for alcohol on February 24, 2022.

3. During an unannounced home visit from WCCYS on March 1, 2022, Mother's field screen was positive for methamphetamine /amphetamine, and the WCCYS caseworker witnessed Mother consuming alcohol during this visit.

4. Mother tested positive for alcohol on March 15, 2022 and March 16, 2022.

5. Mother tested positive for methamphetamine/amphetamine on March 31, 2022.

6. Mother has refused to drug screen since March 31, 2022.

7. Since the last review date of February 8, 2022, Mother has not kept in consistent contact with WCCYS.

Opinion and Decree, 6/16/22, at 2-3.

The record supports these findings. For example, Ms. Mooney testified that since November 1, 2021, Mother was "offered 66 visits and has missed 23 of them and 8 of those visits had been missed since the last review period."

N.T., 6/7/22, at 12. Ms. Mooney explained the missed visits were "due to [Mother] not confirming with the agency, three of those were no show visits, one was due to the fifteen-minute rule, in which [Mother] did not show up in the time frame given. And one [Mother] had declined." *Id.*

Ms. Mooney further testified Mother "has not maintained her mental health services." *Id.* at 27. Ms. Mooney stated Mother "had not reported any mental health services to myself until I recently heard that she was attending the Wright Center for mental health services." *Id.* at 27-28. Ms. Mooney asked Mother to sign releases for information from the Wright Center, but Mother reported "the Wright Center does not do releases," although Ms. Mooney had "never had an issue before with that." *Id.* at 28. Mother refused Ms. Mooney's request to sign a general release. *Id.* at 28-29

Regarding "the major issue" of Mother's drug use, Ms. Mooney testified that Mother "obtained drug and alcohol evaluations, but she has not been consistent with following those recommendations." *Id.* at 26, 36. In addition, Mother was not compliant with drug testing. Ms. Mooney stated "the last time she screened for the agency was March 31st of 2022 in which she was positive for methamphetamines." *Id.* at 32. During an unannounced visit to Mother's home around noon on March 1, 2022, Ms. Mooney rang the buzzer, knocked on the door, and called Mother's name without success. *Id.* at 33-34. Ms. Mooney contacted Mother's mother, who "reported [Mother] was home, but she was sleeping." *Id.* at 34. Mother then called Ms. Mooney and "let [Ms.

Mooney] and the other caseworker into the home." *Id.* Ms. Mooney described

Mother's behavior as "very erratic." *Id.* Mother was "pacing a lot … talking

very, very fast," and drinking alcohol. *Id.* at 34-35. Mother admitted to using

methamphetamines two hours prior. *Id.* at 35.

Ms. Mooney summarized that Mother would

sporadically screen for the agency and she was frequently positive for methamphetamines and or alcohol. [Mother] was positive for methamphetamines [in 2021] on November 10th, November 25th, December 7th, December 8th and January 4th[, 2022]. On February 24th[, 2022,] she tested positive for alcohol and her levels were higher than the lab could register. And then on March 1st[, 2022,] at the unannounced home visit she did screen and the field screen came back positive for methamphetamines and her prescribed Subutex, however, she could not produce enough for the lab to confirm that, but the field screen did in fact say positive for methamphetamines and [Mother] did admit … she had used two hours prior.

*Id.* at 38.

According to Ms. Mooney, WCCYS recommended Mother for "detox

inpatient" in March 2022. *Id.* at 39. Ms. Mooney testified that although

Mother

went to detox on March 4th of 2022, … it's unclear how long [she] stayed there as she did text me on March 7th of 2022, and then [she ca]me to her morning visit on March 8th and due to no signed releases [for] a record of her staying we cannot confirm how long she remained in detox.

. . .

[Mother] at this time had begun frequently refusing to do drug screens[,] she would state I'd rather not, it's not in my best interest or stating to the visitation worker that she was not going to screen because it would be the same as the last screen. At this time [in March 2022,] the screens were also coming back diluted

- 10 -

… with state[ments] from the lab to use caution or caution should be used when [interpreting] those results. So it would either come back diluted or they were coming back positive for alcohol or methamphetamine.

*Id.* at 39-40. Mother's most recent drug screen on March 31, 2022, was positive for methamphetamine; Mother has "not provided any drug screens" since. *Id.* at 41.

With respect to Mother's communication with the agency, Ms. Mooney testified:

[Mother] has not kept in consistent contact with the agency … she has begun not responding to text messages or would go days without responding, not answering phone calls. Whenever I would attempt to talk to [Mother] or attempt to talk to her about the case and progress, [Mother] would get irate, end phone calls and leave meetings.

*Id.* at 27.

The above evidence refutes Mother's claim of her "compliance and willingness to remedy the situation." Mother's Brief at 13. The trial court concluded:

WCCYS presented credible evidence that Mother has refused to cooperate and communicate with WCCYS. Mother has a history of drug use throughout [Child's] dependency, including the time [Child] was returned to her care in October 2021 as evidenced by the positive drug screen results. Mother has not been in consistent contact with WCCYS and exhibited unwillingness to cooperate with WCCYS. Since March 31, 2022, Mother has refused to submit to drug screenings. During the last review period, Mother has exhibited minimal compliance and progress with [Child's] permanency plan.

\*\*\*

- 11 -

Mother testified that the reason for [her] refusing drug screens after March 31, 2022 is that she was using tetrahydrocannabinol (THC). Mother is not in possession of a medical marijuana card allowing for the legal use of THC. Mother's use of other illegal substances, *e.g.*, methamphetamine and amphetamine, throughout the dependency period demonstrates her inability to meet [Child's] needs and provide for [Child's] welfare. Both Mother and Father have demonstrated instability, lack of cohesion and inability to provide for a basic living environment [for Child].

Opinion and Decree, 6/16/22, at 6-7, 8.

Our review indicates the trial court acted within its discretion in finding that Mother's repeated and continued incapacity cannot or will not be remedied. We discern no error in the termination of Mother's parental rights under Section 2511(a)(2).

## Section 2511(b)

Mother also argues the trial court erred in finding support for termination under Section 2511(b), which requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." Mother's Brief at 21 (quoting 23 Pa.C.S.A. § 2511(b)).[4] Mother asserts the "record is devoid of any evidence demonstrating how [C]hild's needs and welfare would be met by granting termination." Mother's Brief at 21. We disagree with Mother's assessment of the record.

---

[4] Mother's second issue regarding grounds for termination under 23 Pa.C.S.A. § 2511(a)(8) is rendered moot by our disposition affirming grounds for termination under 23 Pa.C.S.A. § 2511(a)(2). **See** Mother's Brief at 18-20; **In re A.S.**, 11 A.3d at 478 (this Court need only agree "as to any one subsection in order to affirm the termination of parental rights.").

"Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). When the trial court considers a child's needs and welfare, the "extent of any [parental] bond analysis ... necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. 2008).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d at 483 (citations omitted).

The bond between Mother and Child is not disputed. The expert psychologist, Dr. Tunilo, testified that she prepared a written report in June 2022 (Exhibit 4), based on her observation of Mother and Child, interview with Mother, phone interview with foster parents, and information provided by Ms. Mooney. *Id.* at 79-80. Like Ms. Mooney, Dr. Tunilo concluded that Mother and Child have a bond. *Id.* at 14; 80. However, Dr. Tunilo found that the bond had been severed. *Id.* at 82. Reading from her report, Dr. Tunilo testified:

> At this point in the relationship the bond between [Child] and [Mother] has already been challenged. [Child] going back with

- 13 -

[Mother] will create further distress due to adjustment and severed attachment of [Child] and her foster family. Returning to [Mother] would not reverse the experience for [Child], but rather create a second trauma.

*Id.* at 82 (reading from Exhibit 4, page 4).

Ms. Mooney testified that Child has been in placement for 16 months and has established a bond with her foster parents, who "have identified themselves as an adoptive resource." N.T., 6/7/22, at 47. Consistent with Ms. Mooney's testimony, the trial court stated:

[Child] was placed in foster care with [foster parents] multiple times throughout her dependency. She returned to the care of [foster parents] for the third time on February 18, 2022. There is a bond between [Child and foster parents, who are an "adoptive resource"].

*Id.* at 3; *see also* N.T., 6/7/22, at 18, 47 (Ms. Mooney opining that foster parents have an established bond with Child, who is doing well and "adjusted quickly to her return" to foster parents).

The trial court further opined:

As to the best interests of [Child] under 23 Pa.C.S.A. § 2511(b), WCCYS presented credible evidence that termination of parental rights would best serve [Child's] needs and welfare. Testimony indicated [Child] is bonded with Mother. Testimony also confirmed [Child] is bonded with the family that has been identified to provide permanency for her. The parental obligation is a positive duty that requires affirmative performance. *In re Z.P.*, 994 A2d 1108, 1119 (Pa. Super. 2010) (citing *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004)). **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide [for the child's] physical and emotional needs.** *Id.* (emphasis in original).

\*\*\*

[I]t is in the best interest of [Child] that the parental rights be terminated. This will allow [Child] the permanency she deserves.

Opinion and Decree, 6/16/22, at 7-8.

As the record supports the trial court's reasoning, we discern no error by the trial court's termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2022